IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

AMANDA HUGHES,

               Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

               Defendant.

OPINION AND ORDER

21-cv-367-slc

---

Plaintiff Amanda Hughes seeks judicial review of a final decision of defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration,[1] denying her claim for disability insurance benefits (SSDI) and supplemental security income (SSI) under the Social Security Act. 42 U.S.C. § 405(g). Hughes contends that the administrative law judge (ALJ) who denied her claim: (1) failed to cite logical reasons, supported by evidence in the record, for her decision to discount medical opinions favorable to Hughes's claim; (2) did not properly account for certain limitations (sitting, change of position, leg elevation, and concentration, persistence, or pace) in the residual functional capacity (RFC) assessment; and (3) erred in evaluating Hughes's subjective symptoms.[2] Because I am not persuaded that any of the issues raised by Hughes warrant remand, I am affirming the Acting Commissioner's decision denying Hughes benefits.

---

[1] Because Kilolo Kijakazi has replaced Andrew Saul as the head of SSA, I have amended the case caption accordingly.

[2] As now is commonplace, Hughes also challenges the ALJ's authority under *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), a challenge this court has repeatedly rejected. *See Klawitter v. Kijakazi*, No. 21-cv-216-slc, 2022 WL 842915, at *6 (W.D. Wis. Mar. 22, 2022)(collecting cases). Because Hughes cites no contrary authority from the Seventh Circuit–or anywhere else–I reject her challenge for the same reasons without further discussion.

## FACTS

The following facts are drawn from the Administrative Record (AR), filed with the Commissioner's answer in this case:

On September 14, 2014, Hughes filed SSDI and SSI applications for a period of disability beginning on June 30, 2014, when she was 29 years old.  AR 244-51, 1037.  The Agency denied her claims initially on January 15, 2015 and then on reconsideration on May 29, 2015.  AR 171-84.  Following a hearing requested by Hughes, AR 185-86, ALJ Kathleen Kadlec denied benefits on June 28, 2017.  AR 13-29.  After the Appeals Council denied review on April 20, 2018, AR 1-5, Hughes appealed the ALJ's decision to the Court of Appeals for the Seventh Circuit, which remanded pursuant to a joint stipulation, AR 1123-27.  Following a telephonic hearing on November 25, 2020 at which Hughes and a vocational expert (VE) testified, ALJ Kadlec again denied benefits on February 18, 2021.  AR 1013-39.

The ALJ determined that Hughes is severely impaired by inflammatory spondyloarthropathy/ankylosing spondylitis, osteoarthritis of the knees, sacroiliitis/sclerosis of the sacroiliac joints, degenerative joint disease of the lumbar spine, myalgia, obesity, affective disorder, and an anxiety disorder.  AR 1015-16.  After finding that Hughes's impairments were not severe enough to meet or medically equal the criteria for a listed disability, the ALJ found that Hughes retained the RFC to perform a limited range of sedentary work.  AR 1017, 1020.  Specifically, the ALJ found that Hughes had the following limitations:  occasionally operate foot controls bilaterally; frequently operate hand controls, handle, finger, feel, and reach in all directions bilaterally; occasionally climb ramps and stairs but not ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; no work at unprotected heights; occasional work

around moving mechanical parts and vibration; occasionally operate a motor; perform simple, routine, and repetitive tasks and make simple work-related decisions; occasionally have contact with the co-workers and supervisors; and occasionally interact with the public.  AR 1020.

The ALJ considered numerous medical opinions on Hughes's physical and mental limitations in making her RFC assessment.  The medical sources provided the following opinions about Hughes's physical limitations:

1. During record reviews in January and April 2015, state agency physicians Dr. Mina Khorshidi (initial level) and Dr. Syd Foster (reconsideration level) concluded that Hughes could perform a full range of light work.  AR 119-20, 149-51.

2. On April 6, 2016, Nurse Practitioner Katherine Phillips-Riemer, who treated Hughes for rheumatology issues, stated in a questionnaire that Hughes could not perform even sedentary work because she had the following limitations:  rarely using her hands; elevating her legs 50% of the workday; sitting 45 minutes at a time; sitting, standing, and walking less than two hours a day; and needing to switch positions from sitting to lying down at least hourly.  She also stated that Hughes's mental health and immunosuppressant medication would affect her ability to work.  AR 538-40.

3. On February 25, 2017, Dr. Jennifer Somers (treating physician until September 2018) stated that Hughes's conditions often interfered with her attention and concentration, limited her sitting to 30 minutes at a time and four hours total in a workday, and would cause more than four absences from work a month.  AR 860-63.

4. In December 2019 and March 2020, Dr. Michele Malloy (treating physician since September 18, 2018) noted that Hughes could sit about 4 hours and stand/walk less than 2 hours in an 8-hour workday, can occasionally lift and carry 10 pounds, would need to switch positions at will, would need unscheduled breaks every 30-60 minutes, and would be absent from work more than four days a month due to her symptoms.  AR 1572-74, 1677-80.

5. In March 2020, Dr. Terry Mangin examined Hughes for the agency, finding that Hughes could frequently stand (up to 2/3 of workday) and occasionally walk (up to 1/3 of workday), had a limited ability to bend or stoop, and was limited by lumbar degenerative disease and radicular symptoms.  AR 1595-98.

3

6.   In March 2020, Dr. Marc Young conducted a record review for the Agency and concluded that Hughes could perform light work while occasionally climbing ramps and stairs; occasionally climbing ladders, ropes, and scaffolds; and occasionally balancing.  AR 1166-68.

The ALJ gave some weight to Dr. Mangin's opinion but gave the remaining opinions little or

minimal weight.

The ALJ also considered several opinions on Hughes's mental limitations:

1.   State agency examining psychologist Dr. Gordon Herz opined on December 10, 2014 that Hughes could understand, remember, and carry out simple instructions; would have ineffective interaction with co-workers and supervisors *when* she was focused on her mental and physical challenges; would have reduced concentration, attention, and work pace (CPP) *at times with* heightened preoccupation with personal issues; and would have slight-to-moderate difficulty withstanding routine work stresses and adapting to changes.[3]  AR 500-03.

2.   During record reviews in January and May 2015, state agency psychological consultants Esther Lefevre and Jan Jacobson concluded that even with some moderate limitations in social functioning, Hughes could perform the mental demands of simple, routine unskilled work, adapt to routine workplace changes, and relate adequately with supervisors, co-workers, and the general public.  AR 120-21, 151-52.

3.   State agency examining psychologist Dr. Jean Warrior opined on May 22, 2015 that Hughes could understand, remember, and carry out simple one- and two-step instructions,[4] could respond appropriately to others in the workplace, has mildly reduced ability to respond to work stressors, and her CPP would be moderately reduced due to intrusion of pain and occasional anxiety.  AR 530-35.  She wrote that Hughes's primary issue has been regularly attending work and persisting through a full work week given her "pain issues."  AR 535.

4.   In January 2017, Dr. Heather Huang (treating psychiatrist since 2015) stated in a questionnaire that Hughes had marked difficulties in maintaining social functioning and CPP, and her impairments and treatment would cause her to be absent from work every day.  AR 563-64.

---

[3] Dr. Herz did not say how much or how often Hughes's social functioning or CPP would be impaired.

[4] In their joint motion for remand, which the court granted, the parties specifically highlighted the need for the ALJ to consider both Warrior's and Herz's instruction limitations.  AR 1123-24.

5.    In December 2019, Dr. Huang opined that Hughes had at least moderate limitations in all functional areas—understanding and memory, CPP, adaptation, and social interactions.  She assessed Hughes with marked limitations in sustaining attention and persisting with simple tasks for two hours at a time and sustaining work effort, duties, and maintaining regular attendance and punctuality across a work week without interruptions from psychologically based symptoms.  Dr. Huang also opined that Hughes would be absent from work more than four days a month.  AR 1569-70.

6.    In February 2020, Dr. Robert Barthell reviewed the record for the Agency and opined that Hughes had moderate limitations in several abilities related to concentration and persistence, social interaction, and adaptation.  AR 1168-69.  He also opined that Hughes could follow simple, repetitive one-to-three step tasks and would work best in settings with a routine and limited social interaction.  AR 1169.

The ALJ gave little weight to the opinions of Drs. Warrior and Huang, but she found the opinions of Drs. Herz, Lefevre, and Jacobson to be moderately persuasive.  The ALJ did not make any specific finding with respect to Dr. Barthell.

The ALJ summarized Hughes's subjective complaints, including that she has pain in her back, hips, knees, and ankles; her pain is a 6 out of 10 even with medication; she has to lie down and elevate her feet to get comfortable and has to elevate her feet 80% of the day to reduce swelling; she has difficulty driving, using a computer, dressing, and showering and can no longer grocery shop; she only can stand five minutes, walk one block, sit for 20 minutes, and lift less than a gallon of milk; she has headaches about once a week; she does not sleep well; she has anxiety and depression and does not see friends; and she spends her days napping and watching television in bed.  AR 1020-21.  The ALJ determined that Hughes's medically determinable impairments could be reasonably expected to cause her alleged symptoms, but the ALJ was not persuaded that Hughes was as limited as she said she was.

5

The ALJ offered the following reasons for discounting Hughes's testimony and the extreme limitations found by the examining and treating physicians:

- Mental status examinations uniformly documented intact cognition, attention, concentration, memory, and insight. AR 1023, 1028, 1032.

- Treatment records revealed that Hughes was not in distress and did not exhibit pain behaviors during examinations. She had a normal gait throughout the record (apart from October 2016, when Hughes underwent lower back surgery) and did not document difficulty sitting or consistent/significant leg swelling. AR 1022, 1028, 1033-35.

- Hughes was able to care for herself and her cat, garden, ride a stationary bike, take care of her niece and nephew 4-7 days a week, crochet, and go tubing with friends a couple of times. AR 1027, 1032-35. Hughes also reported going to a Halloween party in October 2019 and having more social engagements over the weekend. AR 1030, 1034.

- Hughes did not comply with a number of recommended treatments for pain management, including water therapy, a nerve block, bariatric surgery, and a pain management clinic. AR 1027, 1035. She also was discharged from psychotherapy a number of times in 2015 due to failure to return—despite the fact that she was allowed more time for missed appointments to accommodate her illness. AR 1029.

- Hughes was able to get pain relief and increase her activity level with medications (e.g., Cimzia, Cosentyx, Celebrex, low dose Naltrexone, and prednisone), and by August 2020, her chronic pain was stable. AR 1022-23, 1026-27, 1033-35. Her depression and anxiety also were well-controlled on medication. AR 1028, 1030.

Relying on the testimony of the VE, the ALJ found that Hughes could perform work in the representative occupations of eyeglass assembler, circuit board tester, and costume jewelry maker. AR 1038. Therefore, the ALJ concluded that Hughes was not disabled at any time from her onset date through the date of her decision. The Appeals Council declined to review the

6

ALJ's decision, making that decision the final decision of the Acting Commissioner for purposes of judicial review.

## OPINION

In reviewing an ALJ's decision, I must determine whether the decision is supported by "substantial evidence," meaning "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted).  This deferential standard of review means that the court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] judgment for that of the Commissioner." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quoting *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019)); *see also Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022) (noting substantial evidence is not high threshold: "[w]e will affirm ALJ decisions to deny disability benefits when the ALJ follows applicable law and supports its conclusions with substantial evidence.").  We also do not "scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision.  Rather, the administrative law judge must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) (citations omitted); *see also Deborah M.*, 994 F.3d at 788 ("an ALJ doesn't need to address every piece of evidence, but he or he can't ignore a line of evidence supporting a finding of disability"); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("[T]he ALJ must . . . explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

Hughes's challenges to the ALJ's decision all relate to how the ALJ weighed the medical evidence and translated her findings into the RFC assessment.  Specifically, she contends that the ALJ:  (1) improperly discounted the mental limitations assessed by the state agency examining psychologists, Drs. Herz and Warrior; (2) did not support her physical RFC findings with any medical opinion and failed to adopt limitations related to sitting, changing positions, leg elevation, and CPP; and (3) erred in evaluating Hughes's subjective symptoms.  Because Hughes's arguments regarding the examining psychologist opinions and CPP limitations overlap, I will consider them together and then address her arguments regarding her physical limitations and subjective complaints.

## I.  Examining Psychologists

Under the regulations applicable to Hughes's benefits application, an ALJ generally gives more weight to the medical opinion of a source who has examined a claimant than to the medical opinion of a medical source who has not examined a claimant.  20 C.F.R. § 404.1527(c)(1).  However, an ALJ may discount an examining physician's opinion and credit a non-examining physician's opinion for reasons supported by substantial evidence in the record. *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014); *see also Czarnecki v. Colvin*, 595 Fed. Appx. 635, 642 (7th Cir. 2015) ("[R]ejecting or discounting the opinion of the agency's own examining physician . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step.").  The regulations applicable to Hughes's claim also require ALJs to consider the following factors in evaluating any non-treating medical opinion:  the support and explanation provided for the opinion, the opinion's consistency with the medical

record as a whole, the source's specialization, and any other factors that "tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c)(3)-(6). However, a failure to explicitly discuss each regulatory factor is typically not a stand-alone basis for remand. *See, e.g.*, *Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008); *Nelson v. Saul*, No. 19-cv-79-jdp, 2019 WL 6522402, at *2 (W.D. Wis. Dec. 4, 2019).

Hughes criticizes the reasons that the ALJ gave for discounting Herz's and Warrior's opinions and faults the ALJ for not considering how their opinions were consistent with the opinions of the state agency reviewing psychologists (Drs. Lefevre, Jacobson, and Barthell).

### A. Dr. Herz

In addition to finding Hughes capable of understanding, remembering, and carrying out simple instructions, Dr. Herz opined that Hughes would have ineffective interaction with co-workers and supervisors when she was focused on her mental and physical challenges; reduced CPP when struggling with health difficulties; and slight-to-moderate difficulty withstanding routine work stresses and adapting to changes. Although the ALJ found Dr. Herz's opinion generally consistent with the overall record and gave it moderate weight, she reasonably concluded that Herz did not address all of Hughes's limitations in "vocationally relevant terms." AR 1031-32. As the Acting Commissioner argues, Herz did not articulate the frequency or degree to which Hughes's concentration, persistence, or pace and social interactions would be reduced during an eight-hour workday. *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018) ("Dr. Roth's reports contain symptoms and diagnoses, but not a prognosis, a discussion of what [the claimant] could do despite her impairments, or an assessment of her physical restrictions.

By contrast, a medical opinion is a statement that reflects a judgment about the nature and severity of the impairment, including symptoms, diagnosis, prognosis, what the claimant can still do despite the impairment, and any physical or mental restrictions."); *Dudley v. Saul*, Herz. No. 1:20-cv-87, 2021 WL 3146531, at *7 (N.D. Ind. July 9, 2021) (finding that medical opinion used "equivocal language" that was "not readily translated into functional terms" where it stated that claimant "may be able to emotionally relate appropriately with others most of the time, however there may be some concerns in this regard").

Hughes argues that it is the ALJ's duty to assess the functional limitations, 20 C.F.R. § 404.1546(c), and if the ALJ needed additional clarification, she should have contacted Dr. Herz. *See e.g.*, *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) ("If the ALJ found this evidence insufficient, it was her responsibility to recognize the need for additional medical evaluations."). However, the ALJ was under no obligation to recontact Dr. Herz.  The regulations provide that an ALJ "may" recontact a medical source if the ALJ is unable to render a decision because the evidence is insufficient or inconsistent.  20 C.F.R. § 404.1520b(b)(2)(I); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.").

Although the ALJ found Dr. Herz's opinion vague in certain respects, she did not discount the opinion altogether.  The ALJ also did not find the evidence in the record insufficient to evaluate.  She found that Dr. Herz's opinion that Hughes's "concentration has the ability to be normal but will be reduced at times does not provide ample support for a limitation but suggests a limitation to unskilled, repetitive work." AR 1032.  The ALJ reasonably noted that Herz found Hughes able to manage her own funds, "which further supports that the

10

claimant is able to at least perform unskilled work." *Id.* She also determined that the record supports the need for reduced social interactions, which she accounted for by limiting Hughes to occasional contact with co-workers, supervisors, and the public. As discussed further below, these mental limitations are supported by substantial evidence in the record and are consistent with the opinions of the state agency psychological consultants, which the ALJ found moderately persuasive.

### B. Dr. Warrior

Dr. Warrior stated the opinion that Hughes was limited to understanding, remembering, and carrying out simple one and two-step instructions. The ALJ explained that she discounted the opinion because there is insufficient evidence in the record that Hughes's cognition, memory, or judgement are impaired; Hughes has no ongoing pain behaviors; Warrior based her opinion on Hughes's subjective reports of physical pain, which are not within Warrior's specialty; Hughes did not begin to report more pain and obtain more treatment until July 2015, two months after the examination; and Hughes was watching her nieces and nephews four days a week shortly after the examination.

Hughes argues that the ALJ failed to provide good reasons for discounting Dr. Warrior's opinion because contrary to the ALJ's assumption, Warrior did not base the instruction limitation on Hughes's pain or any abnormal memory, judgement, or cognitive findings. However, Dr. Warrior specifically wrote that Hughes's "concentration, attention, and work pace would be moderately reduced *due to an intrusion of pain* and occasional anxiety." AR 535 (emphasis added). Contrary to Hughes's contention, it was reasonable for the ALJ to conclude

that Dr. Warrior based the one- to two-step instruction limitation at least in part on Hughes's subjective reports of pain, even if Warrior did not say so expressly.  As discussed further below, the ALJ provided sound reasons for not crediting the full extent of Hughes's subjective complaints, and she correctly pointed out that Hughes's treatment records did not document behaviors consistent with ongoing pain.  AR 1032-33 (citing AR 581 ("Pleasant female in no apparent distress.  She is pleasant throughout, breathing comfortably"); AR 601 ("neatly groomed female in no acute distress"); AR 629 ("in no acute distress"); AR 642 ("alert and oriented in NAD"); AR 651 ("neatly-groomed female in no acute distress")).

Although Hughes claims that the ALJ cited "select" findings of normal memory, judgment, and cognition, she fails to cite any treatment record documenting Hughes's abnormal findings in these areas.  In fact, Dr. Warrior's own consultative examination documented normal mental status findings:  Hughes had no difficulty following the conversation, gave no indication of being distracted, correctly repeated seven digits forward and five digits backward, spelled "world" correctly both forward and backward, and completed the serial 3s task with only one error.  AR 533.  Dr. Warrior also wrote in the summary section of the report that Hughes "presents as a bright young woman who would be cognitively capable of work."  AR 534.

### C.  Consistency with State Reviewing Psychologists

Hughes makes a perfunctory argument that the ALJ failed to consider the fact that Dr. Herz's and Dr. Warrior's opinions are consistent with the moderate mental RFC assessments made by the psychologists that reviewed the record for the Agency.  Drs. Lefevre and Jacobson rated Hughes as having moderate limitations in accepting instructions and responding

appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; and setting realistic goals or make plans independently of others.  AR 120-21, 151-52.  In 2020, Dr. Barthell found the same moderate social and adaptation limitations and also noted that Hughes was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period; interact appropriately with the general public; and ask simple questions or request assistance.  AR 1168-69.

As the Acting Commissioner points out, the reviewing psychologists identified the moderate limitations in the MRFC1 section of the form, which "aid[s] in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment."[5]   POMS DI 24510.060(B)(2).  The form itself explains that "[t]he questions below help determine the individual's ability to perform sustained work activities," but "the actual mental residual functional capacity is recorded in the narrative discussion(s) . . . documented in the explanatory text boxes following each category of limitation."  AR 120, 151.

---

[5] The MRFC1 worksheet includes several mental functions grouped under four main categories: understanding and memory, sustain concentration and persistence, social interaction, and adaption. Program Operations Manual System (POMS) DI 24510.060(B)(2).  According to the Acting Commissioner, these options are  sometimes referred to as "checkboxes" because that is how they appear on the paper version of the form.

Consistent with this approach, the Seventh Circuit has held that even though a state agency doctor's responses to checkbox questions about the claimant's level of limitation as to a particular function constitute "medical evidence which cannot just be ignored," these "[w]orksheet observations" are "perhaps less useful to an ALJ than a doctor's narrative RFC assessment." *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015). In other words, "even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms." *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) (citing *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014)); *see also Varga*, 794 F.3d at 816 ("[A]n ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations.").

In this case, Drs. Lefevre and Jacobson explained and translated their worksheet observations in the narrative sections of the form by noting that Hughes has some difficulty interpreting interactions with supervisors and slight difficulty adapting to new situations and trying new things but is able to socialize with friends and family, AR 120-21; perform the mental demands of simple, routine unskilled work, AR 121; "sustain at least basic demands associate with relating with supervisors, co workers and general public," AR 151-52; and adapt to routine workplace change, AR 152.[6] Dr. Barthell wrote in the narrative sections of his form that Hughes could follow simple, repetitive, one-to-three step tasks and would work best in settings with a routine and limited social interaction. AR 1169. Hughes has not developed a meaningful

---

[6] Consistent with their MRFC ratings and narrative statements, Lefevre and Jacobson found that Hughes had moderate difficulties in the general area of social functioning and only mild difficulties in the broad functional area of CPP. AR 117, 148.

argument that the reviewing consultants' narrative statements failed to adequately encapsulate and translate their worksheet observations related to CPP, social interactions, and adaptation.

In her RFC assessment, the ALJ limited Hughes to simple, routine, and repetitive tasks, simple work-related decisions, occasional contact with co-workers and supervisors, and occasional interaction with the public.  Although Hughes suggests that the RFC assessment should have included more limitations, she does not argue that the ALJ missed any restrictions in the consultants' narrative translations.  *See Burmester*, 920 F.3d at 511 ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination."); *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("[A]n ALJ may rely on a doctor's narrative where it adequately translates those worksheet observations."); *Milliken v. Astrue*, 397 F. App'x 218, 221 (7th Cir. 2010) (ALJ entitled to rely on medical expert who "effectively translated an opinion regarding the claimant's mental limitations into an RFC assessment").

Hughes also makes the perfunctory argument that the ALJ failed to consider the fact that Dr. Warrior's one and two-step instruction limitation is consistent with reviewing consultant Dr. Barthell's limitation of one to three-step tasks.  She points out that the ALJ's RFC limitation of simple, routine, repetitive tasks cannot rehabilitate this error because the limitation to one-to-two step tasks may be more restrictive.  *See Schlattman v. Colvin*, 12 C 10422, 2014 WL 185009, *7 (N.D. Ill. Jan. 14, 2014) ("[T]here is a significant difference between one- to two-step tasks and simple, routine, repetitive tasks.").

Hughes is correct that the ALJ did not discuss Dr. Barthell's opinion in her decision, focusing instead on the earlier opinions of Drs. Lefevre and Jacobson.  However, any error that

the ALJ may have committed in this respect is harmless because a remand for explicit consideration of Barthell's task restriction would not affect the outcome of this case.  *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021) ("[I]f the error leaves us convinced that the ALJ would reach the same result on remand, then the error is harmless and a remand is not required.") (citing *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018)); *Henke v. Astrue*, 498 F. App'x 636, 641 (7th Cir. 2012) (ALJ's failure to assign weight to opinion of state-agency medical consultant harmless error where report would not have aided claimant's case).  Dr. Barthell's limitation of one- to three-step tasks and Dr. Warrior's limitation of one- and two-step instructions are both consistent with a significant number of jobs relied upon by the ALJ at step five.  The costumer jewelry maker position (165,000 existing jobs[7]) requires a reasoning level of one, which involves applying "commonsense understanding to carry out simple, one- or two-step instructions." DICOT 735.687-034 (G.P.O.), 1991 WL 679985; Appendix C - Components of the Definition Trailer, 1991 WL 688702; *see also Lyn P. v. Saul*, No. 19 C 1596, 2021 WL 2823089, at *9 (N.D. Ill. July 7, 2021) (citing *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021)) ("The Seventh Circuit defines . . . 'simple' instructions as those 'with at most two steps, or GED level one reasoning,' which accords with the ALJ's mental RFC determination.").  In addition, several courts have concluded that a limitation to one- to three-step *tasks* is consistent with reasoning level one.  *See id.* (reasoning level one jobs consistent with medical expert's opinion that claimant limited to "one to three step tasks"); *Schlattman*, 2014 WL 185009, *7 (collecting cases holding same).

---

[7] *Primm v. Saul*, 789 F. App'x 539, 546 (7th Cir. 2019) (110,000 jobs in the national economy was sufficient); *Weartherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (140,000 jobs was "well above the threshold of significance").

Accordingly, Hughes has not shown that the ALJ committed reversible error in evaluating the examining psychologists' opinions.

## II.  CPP Limitations

Citing cases in which the court of appeals has held that restrictions for "simple," "routine," and "repetitive" work do not adequately encapsulate a restriction for moderate limitations in concentration, persistence and pace," *see, e.g.*, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), Hughes contends that the ALJ's RFC limitation of work involving simple, routine, repetitive tasks and simple work-related decisions does not adequately account for her moderate limitations in CPP.  Hughes generally argues that the consultative examiner opinions (by Herz and Warrior), Dr. Barthell's MRCF1 ratings in areas related to CPP, and her self-described difficulties with concentration and persistence[8] support the need for additional work restrictions relating to "some time off task" and "pace and production."

Hughes bases her argument on the assumption that "moderate limitations in concentration, persistence, and pace" means the same thing in all cases.  This assumption is incorrect.  CPP is simply a general category that must be translated into particular limitations.  The phrase does not necessarily communicate what a claimant can or cannot do.  This is why the RFC does not say moderate limitations in concentration, persistence, or pace.  That would mean nothing to a vocational expert, or to anyone else.  *Lindemann v. Saul*, No. 18-cv-932-jdp, 2019 WL 2865337, at *1 (W.D. Wis. July 2, 2019).

---

[8] Hughes lists various symptoms that she reported to her treating physicians and to Herz and Warrior.  *See* AR 501, 532 (crying spells); AR 503 (preoccupation with personal health issues); AR 532 (panic attacks); AR 532, 614 (anxiety); AR 533 (tasks not completed); AR 533 (distraction); and AR 563, 641, 774 (difficulty thinking/concentrating).

As explained above, Dr. Barthell translated his ratings for the general categories related to CPP into specific restrictions in the narrative section–as the worksheet instructed him to do–and the ALJ incorporated the narrative restrictions into the RFC.  Hughes does not contend that Dr. Barthell failed to translate his worksheet observations adequately or that the RFC is missing any of the restrictions in any of the consultants' narratives.  With respect to CPP in particular, the ALJ noted that Hughes is able to drive short distances (under 30 miles), prepare microwave or frozen meals, play video games, watch movies and TV, spend about an hour on the computer and do crafts such as crocheting, and pay attention for 30 minutes to an hour. AR 1018.  Further, the ALJ cited Dr. Herz's observation that Hughes appeared "quite able to sustain involvement in the interview for the duration of the hour and sustained her line of thought sufficiently well to express herself," and cited Dr. Warrior's observation that Hughes had no difficulty following the conversation and gave no indication of being distracted.  AR 1018-19.

Apart from her general suggestion that some sort of off-task and production and pace limitations would be appropriate, Hughes identifies no additional restrictions that would better translate Dr. Barthell's ratings.  *See Bolin v. Saul*, No. 20-CV-348-JDP, 2021 WL 567899, at *5-6 (W.D. Wis. Feb. 16, 2021) (finding same).  In fact, the only evidence that Hughes cites regarding CPP are her own subjective allegations, which, as discussed below, the ALJ found unsupported by the record.  *See McGillem v. Kijakazi*, No. 20-2912, 2022 WL 385175, at *4 (7th Cir. Feb. 8, 2022) ("McGillem does not state what (if any) further restrictions would be appropriate, or what evidence there is to support specific further limitations.  He refers generally to time off-task and the need for frequent unpredictable breaks, but he does not quantify these

limitations or show why they are work-preclusive."); *Martin v. Saul*, No. 19-cv-795-jdp, 2020 WL 2847526, at *1-2 (W.D. Wis. June 2, 2020) (rejecting view that RFC restrictions are categorically inadequate to address CPP limitations where plaintiff didn't identify any limitations supported by the record that were missing from the RFC).  Accordingly, Hughes is not entitled to a remand on this ground.

## III.  Physical RFC Limitations

### A.  Unsupported by Any Medical Opinion

Hughes contends that because the ALJ accorded little or minimal weight to the opinions of the state agency consultants (both examining and reviewing) and to all of her treating providers, the physical RFC was unsupported by any medical opinion.  However, there is no rule that an ALJ must fully endorse any of the medical sources in the record.  Under the regulations applicable to Hughes's claim, an ALJ will make an RFC assessment "based on all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3).  Although an ALJ has "to provide reasoning for [his] conclusions and consider all the evidence without interpreting medical records that are beyond the abilities of a lay person to understand," she "isn't required to adopt a particular opinion to support the RFC."  *Olson v. Saul*, 2021 WL 1783136, at *2 (W.D. Wis. May 5, 2021) (citing *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); *Callaway v. Saul*, 2020 WL 2214385, at *2 (W.D. Wis. May 7, 2020)); *see also Fanta v. Saul,* 848 Fed. App'x 655, 658 (7th Cir. 2021) (quoting 20 C.F.R. § 404.1527(d)(2)) ("An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion.").

19

Hughes cites *Suide v. Astrue*, 371 F. App'x. 684, 689-90 (7th Cir. 2010) to support her contention that the lack of reliance on any physician opinion creates an evidentiary deficit. In *Suide*, the court of appeals found that after the ALJ discounted several medical opinions, "[t]he rest of the record simply does not support the parameters included in the ALJ's residual functional capacity determination." *Id.* at 690. However, the ALJ in the instant case considered all of the medical opinions related to Hughes's physical limitations, explained the weight she gave to each opinion, and explained how she based restrictions in the RFC on the portion of the opinions that she found persuasive. Notably, the ALJ's finding that Hughes is capable of limited sedentary work is more restrictive than the light work limitation assessed by the reviewing physicians (Khorshidi, Foster, and Young) and is consistent with Dr. Mangin's (consulting examiner) opinion. *See Burmester*, 920 F.3d at 510 (finding that RFC assessment "more limiting than that of any state agency doctor or psychologist, illustrat[ed] reasoned consideration given to the evidence"); *Palmer v. Saul*, 779 F. App'x 394, 398 (7th Cir. 2019) ("Significantly, the ALJ's RFC findings were more restrictive than the conclusions of those non-examining physicians, and [plaintiff] does not explain how a more restrictive RFC could have negatively affected his claim."). Hughes does not challenge the ALJ's evaluation of those opinions or dispute that they provide substantial evidence in support of the RFC assessment.

### B. Additional Restrictions

Hughes argues that the ALJ erred by not adopting sitting, change of position, and leg elevation limitations and by not considering the exacerbating effect of her "morbid obesity" on her sitting. As Hughes points out, her treating providers—Nurse Practitioner Philips-Riemer,

Dr. Somers, and Dr. Malloy—issued opinions that Hughes has limitations that prevent her from performing even sedentary work: Phillips-Riemer limited Hughes to sitting 45 minutes at a time and no more than two hours a day, switching positions from sitting to lying hourly, and elevating her legs 50% of the time. Somers concluded that Hughes could sit only 30 minutes at a time and four hours total, and Malloy stated that Hughes could sit about four hours and would need to switch positions at will.

The ALJ gave little weight to the opinions of Somers, Malloy, and Phillips-Riemer, finding that they were unsupported by the objective medical evidence. AR 1033-35. As discussed above, the ALJ pointed to Hughes's lack of ongoing pain behaviors/distress during examinations, daily activities and hobbies (gardening, going tubing, caring for children, and riding a stationary bike), lack of significant medical findings on examination (some pain and tenderness with limited range of motion but normal gait), positive response to medications (Cimzia, Celebrex, leflunomide, Cosentyx, and low-dose naltrexone), improvement after her 2016 back surgery, failure to follow through with multiple recommendations for warm water therapy, lack of ongoing complaints regarding use of her hands and sitting, mild and intermittent ankle swelling, and limited need for treatment in 2017 and 2018. *Id.* (citing, *e.g.*, AR 451-79, 582, 629, 659, 775-76, 795, 1475-93). Hughes challenges the ALJ's reasoning on seven grounds:

*First*, Hughes points to her self-reported difficulty with sitting and her need to elevate her legs. *E.g.*, AR 45, 49, 1060 (hearing testimony that she elevates legs/feet to help with pain and swelling and can sit only 30-60 minutes at a time), 298 (function report stating she can sit for 1 hour without a break and 6 hours total), 363 and 1385 (obesity questionnaires stating

problems with prolonged sitting), 470 (report to pain management of sitting intolerance), 534 (report to Dr. Warrior that she had to leave last job because she could not get up and move around), 1373 and 1381 (function reports stating that she can sit only 20-30 minutes), 1502 (June 2019 report to Dr. Malloy's office that "sitting is the most painful").  However, as the Acting Commissioner points out, of the numerous records that Hughes cites, only the July 2019 treatment note reports a contemporaneous report by Hughes of pain while sitting.  The ALJ explicitly acknowledged this treatment note in her decision, AR 1024 (citing AR 1502), but found that other examinations near and after that date did not document any complaints about sitting. AR 1024 (citing AR 1619), 1025 (citing AR 1661), 1026 (citing AR 1593, 1518, 1619, 1657-58, 1661).  Hughes does not identify any error with respect to the other treatment records that the ALJ referenced.  *See Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 885 (N.D. Ill. 2019) ("[N]othing prevented him from reporting his problems to the doctors . . . But he didn't—as common sense would dictate he would have . . . The absence of complaints where it would have been natural to have made them is a substantial basis for rejecting or discounting Plaintiff's present claims.").

*Second*, Hughes perfunctorily states that the ALJ "failed to set forth an assessment of the exacerbating effect of Ms. Hughes' morbid obesity on her sitting ability."  Dkt. 20 at 16.  However, Hughes did not develop any meaningful argument about the specific impact her obesity has on her sitting, nor does she identify any evidence that the ALJ overlooked or that requires greater restrictions than what the ALJ found.  *See Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) ("An ALJ's failure to explicitly consider an applicant's obesity is harmless if the applicant did not explain how her obesity hampers her ability to work.") (citations and internal

quotation marks omitted); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (rejecting argument that ALJ's failure to consider obesity required reversal when plaintiff "does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk"). In any event, contrary to Hughes's contention, the ALJ reasonably explained that she "considered how the claimant's weight affects her ability to perform routine movement and necessary physical activity within the work environment." The ALJ noted that there are no obesity-related limitations in the record other than "notes indicating that obesity can be adding to the claimant's pain [and] that the claimant's obesity is severe." AR 1027. The ALJ also noted that there was no evidence that Hughes followed through with a referral to a bariatric surgeon to discuss possible bariatric surgery, despite the fact that her obesity was an influential factor in her pain. *Id.*

*Third*, Hughes's argues that the ALJ did not reach the correct conclusion with respect to her need to elevate her legs on a regular basis. The ALJ found that there is "no directive" that Hughes elevate her feet, there are no consistent complaints or findings of lower extremity swelling in the record, and that Hughes admitted in her hearing testimony that she does not wear compression stockings as often as recommended. AR 1016, 1027-28. These findings are supported by substantial evidence in the record and they provide a reasonable basis for not crediting Hughes's stated need for a leg elevation restriction. *See Anders v. Saul*, 860 F. App'x 428, 434 (7th Cir. 2021) ("As the ALJ emphasized, there is no record evidence from Anders's treatment providers recommending that he elevate his legs at all, let alone at the frequency and duration that Anders reported."); *Blanchard v. Saul*, No. 18-cv-1166, 2019 WL 3220397, at *4 (E.D. Wis. July 15, 2019) (ALJ appropriately noted that "there was no reference or

23

recommendation by a doctor or care provider for leg elevation" in discounting claimant's testimony that he elevated his legs 50% of the day) (internal quotation marks omitted); *Johll v. Colvin*, No. 13-cv-630, 2014 WL 4678266, at *7 (W.D. Wis. Sept. 18, 2014) (upholding ALJ's subjective symptom analysis where "no treatment notes ever direct[ed] plaintiff to elevate his legs daily").

Although Phillips-Riemer wrote in her RFC questionnaire that Hughes has "swelling" and recommended a leg elevation limitation, AR 538, there is no treatment note in the record directing Hughes to elevate her legs. The ALJ also reasonably concluded that the record showed only mild and intermittent ankle swelling. Contrary to Hughes's contention, Dr. Somers did not document any edema in Hughes's legs or feet in the cited records. *See* dkt. 20 at 16 (citing AR 629 and 667). A nurse practitioner in the rheumatology clinic (not Phillips-Riemer) did note some edema in Hughes ankles once in June 2019 and again in February 2020, but the only recommended treatment was wearing compression stockings. AR 1508, 1510, 1619, and 1621. As the ALJ pointed out, Hughes did not fully comply with the recommended treatment: she testified at the November 25, 2020 hearing that she forgets to wear the stockings consistently. AR 1061. Hughes criticizes the ALJ for not explaining how her inconsistent use of compression stockings negates her need for a leg elevation limitation, but the ALJ reasonably explained that Hughes's failure to comply with this treatment "suggests that her swelling is not as severe as claimed." AR 1016. Accordingly, Hughes has not shown that there is sufficient evidence in the record to compel the need for a leg elevation limitation.

*Fourth*, Hughes argues that the ALJ failed to point to any medical provider who reported an absence of pain behavior[9] that "militated against" her symptoms.  Dkt. 20 at 17.  Although Hughes made verbal descriptions of her pain, the ALJ provided good reasons for finding those complaints inconsistent with the medical evidence in the record and explained that the record did not document nonverbal expressions of pain or distress.  *See* AR1033 (citing AR 581 ("Pleasant female in no apparent distress. She is pleasant throughout, breathing comfortably"), AR 601 ("neatly groomed female in no acute distress"), AR 629 ("in no acute distress"), AR 642 ("alert and oriented in NAD"), AR 651 ("neatly-groomed female in no acute distress")).  The ALJ did not err in taking such reports into account.  *See Taylor v. Kijakazi*, No. 21-1458, 2021 WL 6101618, at *3 (7th Cir. Dec. 22, 2021) (upholding ALJ's RFC assessment that "took account of objective indicators pain from the medical record, like the fact that Taylor expressed no discomfort during particular physical examinations"); *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) (ALJ appropriately considered claimant's lack of symptoms typically associated with pain and doctors' notations of "no apparent physical distress").

*Fifth*, Hughes argues that the ALJ made a "factual error" by stating that Hughes's back pain improved following her October 2016 surgery because Hughes subsequently was "diagnosed with a recurrent disc herniation."  Dkt. 20 at 18 (citing AR 260, 767, 1518).  However, at Hughes's six week follow-up appointment in December 2016, her treating surgeon wrote that she was "doing great but developed some recurrent symptoms" and "[o]verall" she was "doing

---

[9] Hughes cites a medical text stating that pain behaviors can be defined as "verbal descriptions" (e.g., intensity, location, and quality of pain; vocalizations of distress; and moaning or complaining) or "nonverbal" conduct (e.g. withdrawing from activities, taking pain medication, or pain related body postures or facial expressions).  Dkt. 20 at 18 n.10 (citing Keefe F., Pryor R. (2007) *Assessment of Pain Behaviors* in Schmidt R., Willis W. (eds) *Encyclopedia of Pain*. Springer, Berlin, Heidelberg).

much better than compared to her preoperative condition." AR 767. Therefore, it was not unreasonable for the ALJ to conclude that Hughes had improved. The ALJ also explicitly acknowledged the 2018 diagnosis of recurrent disc herniation. In any event, even if the evidence of Hughes's recurrent disk herniation could be read as supporting the treatment providers' opinions, the fact that the ALJ chose to weigh it differently does not mean she committed reversible error. *See Hogden v. Kijakazi*, No. 20-cv-1486, 2022 WL 43328, at *4 (E.D. Wis. Jan. 5, 2022) ("As is commonly true, the evidence here cuts both ways. That the ALJ chose one side over another does not suggest error.").

*Sixth*, Hughes contends that the ALJ did not properly consider the fact that Phillips-Riemer had examined and treated her for years and was a specialist. Although § 404.1527(c)(5) states that "more weight is given to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist," Hughes has failed to provide a persuasive reason why Phillips-Riemr's specialty would have made a difference in this case. The fact that Phillips-Riemer is a specialist and treated Hughes for years does not mean that she is an acceptable medical source.

Under the applicable regulations, an ALJ must minimally articulate her reasons for discounting non-treating source opinions but need not consider explicitly every factor listed under § 404.1527(c). *Grotts*, 27 F.4th at 1277; *see also Sosh v. Saul*, 818 F. App'x 542, 547 (7th Cir. 2020) (finding no error where ALJ "did not explicitly consider every factor listed under § 404.1527(c)" when evaluating treatment provider who did not qualify as acceptable medical source). Rather, an ALJ only needs to "explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows

a claimant or subsequent reviewer to follow the adjudicator's reasoning."   20 C.F.R. § 404.1527(f)(2).  "It is enough for an ALJ to summarize the findings of a non-treating source's opinion and note that those findings are not corroborated by objective evidence in the record." *Grotts*, 27 F.4th at 1277 (citing *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014)).  The ALJ met this standard in considering Phillips-Riemer's opinion.

*Seventh*, Hughes criticizes the ALJ for not discussing each of the factors listed in 20 C.F.R. § 404.1527(c) for determining how much weight to give to the opinions of Drs. Somers and Malloy.  However, apart from pointing out that her treating providers' opinions were consistent, she does not explain how any of the factors not discussed would undermine the ALJ's decision. The fact that medical opinions are consistent with each other does not, in and of itself, establish that any of the opinions were entitled to great weight or that the ALJ erred.  *Gunder v. Saul*, No. 2:20-cv-724, 2021 WL 2350063, at *11 (E.D. Wis. June 9, 2021); *see also Cassens v. Saul*, No. 19-cv-912, 2020 WL 3316094, at *3 (W.D. Wis. June 18, 2020) ("But two flawed opinions do not equal a good one.").  As discussed above, the ALJ considered all of the medical opinions related to Hughes's physical limitations, explained the weight that she gave to each opinion, explained how she based restrictions in the RFC on the portion of the opinions that she found persuasive, and provided sound reasons for rejecting the more extreme limitations.  Accordingly, Hughes has failed to show that this is a basis for remand.

In sum, apart from her own opinion and self-reports, which the ALJ found not entirely consistent with the record,[10] Hughes has not identified medical evidence that would compel a greater level of restriction than that found by the ALJ.  *Loveless v. Colvin*, 810 F.3d 502, 508 (7th

---

[10] The ALJ's findings concerning Hughes's subjective symptoms are addressed below.

Cir. 2016) (A claimant is not entitled to remand if he "does not identify medical evidence that would justify further restrictions."); *see also Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is that [plaintiff] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."); *Delong v. Saul*, 844 F. App'x 894, 900 (7th Cir. 2021) ("[E]ven if the record could support such limitations, there is nothing that compels them."). Accordingly, Hughes has not shown that the ALJ committed reversible error in concluding that Hughes was capable of performing a limited range of sedentary work.

## IV. Subjective Symptoms

An ALJ's evaluation of the claimant's testimony about her symptoms is entitled to deference because the ALJ is in a special position to see, hear, and assess witnesses. *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). The court will overturn the ALJ's assessment of the claimant's testimony only if it is patently wrong, *id*., meaning that it "lacks any explanation or support," *Elder*, 529 F.3d at 413-14. However, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). It is well established that an ALJ's credibility determination may be informed by a claimant's conservative treatment, the lack of objective evidence, the effectiveness of treatment, and inconsistencies between the claimant's statements and her medical records. *See Grotts*, 27 F.4th at 1279 (relying on inconsistencies between claimant's testimony and the record); *Deborah M.*, 994 F.3d at 790 (relying on conservative treatment history); *Olsen v. Colvin*, 551 F. App'x 868, 874-75 (7th Cir. 2014) (same).

Hughes raises only two brief challenges to the ALJ's evaluation of her subjective symptoms:  First, she argues that the ALJ erred by not exploring the possible reasons that Hughes did not pursue treatments like water therapy or regular psychotherapy.[11]  *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (ALJ erred in drawing adverse inference from claimant not undergoing treatment without assessing ability to pay particularly given that claimant was an applicant for SSI benefits).  However, Social Security Ruling (SSR) 16-3p does "not require the ALJ to ask Plaintiff about her failure to seek treatment.  That rule provides that an ALJ must consider possible reasons for a failure to seek treatment."  *Deborah M.*, 994 F.3d at 790 (emphasis added).  Although Hughes says that she "had no income or resources to pursue treatment," she cites nothing in her treatment records or testimony to support this assertion apart from a single, vague statement in an agency function report that she had "no money."  Dkt. 20 at 21 (citing AR 293).  Moreover, Hughes does not explain why lack of income would explain her failure to pursue recommended water therapy or regularly attend psychotherapy appointments that she already had scheduled.  *See Russell v. Saul*, No. 20-cv-102, 2021 WL 457609, at *4 (W.D. Wis. Feb. 9, 2021) (although plaintiff said lack of appointments with her PCP and failure to attend pain clinic appointments could have been because of insurance issues, nothing in the record supported such an inference); *Bekeleski v. Saul*, No. 19-cv-475, 2020 WL 859266, at *7 (W.D. Wis. Feb. 21, 2020) ("[P]laintiff's failure to follow her doctors' recommendations for exercise draws into question her actual interest in improving her health and her ability to walk longer distances.  It may be that plaintiff could not afford the exercise,

---

[11] Hughes also made a statement to this effect in criticizing the ALJ's evaluation of her treating provider opinions, and that argument fails for the same reasons.

but she did not raise that as a problem with any of the doctors who suggested it.").  Without more, Hughes cannot show reversible error on this ground.

Second, Hughes contends that the ALJ did not explain how her daily activities of riding a stationary bike, performing personal care, or grocery shopping were inconsistent with the fluctuating nature of her condition.  However, contrary to Hughes's suggestion, the ALJ did not equate Hughes's daily activities with an ability to perform full time work.  Rather, she identified specific activities and contrasted them with Hughes's own statements about her limitations.  For example, the ALJ contrasted Hughes's testimony that she laid down and elevated her legs 85% of the day with treatment records reflecting her contemporaneous reports of gardening, riding a stationary bike, taking care of her niece and nephew, crocheting, and tubing with friends a couple of times.  AR 1027 (citing AR 502, 554, 613, 658, 1060).  Because the ALJ's reliance on Hughes's daily activities for this purpose was proper and her findings are adequately supported by the record, this court has no basis on which to reverse it her finding.  *Beardsley*, 758 F.3d at 838 (explaining "it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability," but still "urg[ing] caution in equating these activities with the challenges of daily employment in a competitive environment"); *see also Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022) ("Several of Prill's activities are not consistent with her claim that she could not sit, stand, or walk for an extended period and could only rarely kneel, squat, or crouch.  In particular, gardening undercuts her claimed limitations because it is a voluntary activity that involves many of the tasks she argues she cannot perform, at least on a sustained basis.).

In any event, even if the ALJ somehow erred in relying on Hughes's daily activities or failure to comply with treatment recommendations, courts will uphold an ALJ's subjective

symptom finding so long as it is supported by a single valid reason. *See Schrank v. Saul*, 843 F. App'x 786, 789 (7th Cir. 2021) ("[W]e would not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding.") (emphasis added); *Elder*, 529 F.3d at 414 (upholding the ALJ's subjective symptom assessment that was supported by a single valid reason). The ALJ in this case provided several other valid reasons to support her analysis of Hughes's subjective symptoms, so remand is not warranted.

## ORDER

IT IS ORDERED that the that the decision of defendant Kilolo Kijakazi, Acting Commissioner of Social Security, denying plaintiff Amanda Hughes's application for disability benefits, is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 8th day of September, 2022.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge